## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17-40106** |
| **JESUS CHAVEZ,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Defendant Jesus Chavez was indicted on November 15, 2017 on one count of possession with the intent to distribute methamphetamine. On May 2, 2018, defendant filed a Motion to Suppress (Doc. 30) seeking suppression of the seized contraband. The court held an evidentiary hearing on the motion on July 10, 2018. After considering the briefing, the evidence presented at the hearing, and the parties' supplemental briefing filed after the hearing, the court is now ready to rule on the motion.

### I.    Background

On October 12, 2017 at approximately 6:00 pm, Kansas Highway Patrol Trooper Cole McGee was patrolling Interstate 70 in Dickinson County, Kansas. Trooper McGee was stationary and monitoring eastbound traffic when he noticed a blue 2014 Nissan Versa pass in the outside lane. He observed that the driver was attempting to avoid eye contact, which he interpreted as suspicious as he is trained to observe behavior changes of motorists as they approach law enforcement. Trooper McGee also noticed that the black tag bracket attached to the rear license plate was partially obstructing the letters "C," "l," and "f" in the word "California," which he testified was a violation of Kansas law. Trooper McGee began following the vehicle and ran the car's registration through his in-car system. He discovered the tag had been expired for sixty days and was registered to an individual with the last name

"Black." Trooper McGee initiated a traffic stop and approached the vehicle, where he observed defendant and another occupant, identified by a fake identification card as "Carlos Martinez-Tapia." Trooper McGee informed defendant that he had pulled him over because his tags were expired. He began asking defendant questions about where he was traveling and asked both occupants for identification. When Trooper McGee asked "Carlos" whether he had a driver's license, he admitted he was in the country illegally.

Defendant informed Trooper McGee that he had purchased the vehicle the week before, and that he had been stopped 20 minutes prior because of his expired tags. He allegedly provided Trooper McGee with registration information that had been affixed to his front windshield. Approximately five minutes into the traffic stop, Trooper McGee asked defendant if he would come back to his vehicle to talk to him. He told defendant "you're not in trouble." As defendant exited the car, Trooper McGee noticed three cell phones in the driver door and said to defendant, "you have a lot of cell phones." Defendant replied that they did not work. Trooper McGee testified at the hearing that two of the cell phones were older style flip phone, which he associated with drug trafficking.

As defendant and Trooper McGee entered McGee's patrol vehicle, defendant seemed to ask why he had been stopped. Trooper McGee responded that his tags were expired and that it was illegal for him to display the tags on the front windshield; instead they needed to be affixed to the rear of the vehicle. Trooper McGee began running defendant's and "Carlos's" information through dispatch to check for the validity of defendant's license, any criminal history, and for any further details about "Carlos's" identity. While waiting for the information, Trooper McGee continued to ask defendant questions about his travel plans. Defendant claimed that he was coming from Denver, Colorado, but his trip had originated in Los Angeles, California. He explained he was traveling to Kansas City to see a sick uncle in the hospital and planned to stay for three days. Defendant also told Trooper McGee that

he worked in construction. Trooper McGee testified he found this suspicious because defendant's hands were clean, which was not consistent with working in construction. After approximately ten minutes, defendant was heard asking Trooper McGee if he was going to get a ticket, to which Trooper McGee answered no. A few minutes later, dispatch informed Trooper McGee that defendant had a prior conviction for drug trafficking in Oklahoma and that no information could be found for "Carlos," which indicated he was in the country illegally.

Trooper McGee concluded the stop by issuing defendant a warning for the black tag bracket which allegedly obstructed the plate, for displaying a tag that did not belong on defendant's vehicle, and for attaching his registration to his front windshield. He then told defendant "you're free to go." As defendant began walking back to his vehicle, Trooper McGee followed him and asked if he could talk to him, if there was anything illegal in the car, and if he could search the car. Defendant refused to consent to a search and said that he was going to leave. Trooper McGee responded that he was suspicious there were drugs in the car and then contacted dispatch to request a drug detection canine.

Approximately one-hour after the stop was first initiated, Lieutenant Scott Walker with the Kansas Highway Patrol arrived with his police service dog, Zeke. Zeke, a Belgian Malinois, was trained and is handled by Lt. Walker. When Zeke was approximately one-year-old, he completed a ten-week training program to train him to detect the odor of controlled substances and to perform apprehension duties. He was trained to detect the odor of marijuana, cocaine, heroin, and methamphetamine. His training and certification standards were established by an organization called the Utah Post Canine Program. According to Brad Metz, a sergeant in the Shawnee County Sheriff's Office canine unit, the Utah Post standard for certifying police service dogs is widely used throughout the United States and is "a little bit tougher" than other training standards. Sgt. Metz, who has been working with police service dogs since 1996, serves as a judge for the Kansas Highway Patrol's dog training program. He testified

that there is not one particular national certification standard, and each department establishes policies for the training and certification of its police service dogs. The Kansas Highway Patrol requires annual recertification, and each dog is recertified as close to the annual recertification date as possible. Police service dogs are also required to go through a regular maintenance program where they are trained on a weekly or near-weekly basis.

Zeke passed his annual recertification on October 12, 2017, the morning before he was used in the present case. He had previously been recertified on October 3, 2016. As part of his recertification, Zeke was required to participate in seven scenarios related to controlled substances. Sgt. Metz and Officer Cory Flaming of the Overland Park Police Department judged Zeke's recertification. On a scale from one to six—with one being the highest score—Zeke scored a 2.03, which is equivalent to a letter grade of "B." To pass certification, a police service dog must score a minimum of 4.00.

The evening after Zeke's recertification, he was dispatched to perform a sniff on defendant's vehicle. According to Lt. Walker, a dog sniff is initiated by first deploying the dog. Zeke is trained to break the "down" position only to protect his handler from a threat or due to self-discovery of drug odor. When Lt. Walker deployed Zeke, he immediately broke the down position without a command. He began sniffing the vehicle starting with the back trunk seam, and then sniffed along the trunk and the bumper. Lt. Walker testified he considered this "alerting" behavior, where Zeke sensed the odor but had not yet pinpointed the strongest source of the drug odor. Lt. Walker then began guiding Zeke to sniff around the vehicle counter-clockwise starting at the rear wheel. Zeke alerted again on the rear trunk as they moved counter-clockwise around the car. Lt. Walker then began guiding Zeke clockwise around the vehicle. When Zeke locates the strongest scent of the odor, he is trained to "indicate" passively by sitting, freezing, or laying down. Lt. Walker testified Zeke began focusing on and intensely sniffing the trunk and bumper seam, and "froze" along the passenger side of the trunk. His rear quarters went down

a bit and his body posture changed. Lt. Walker testified he considered this behavior change—although it was not his prescribed indicating behavior—as a positive indication, as he had seen him indicate in this manner before. Zeke's "indication" gave the officers probable cause to search defendant's vehicle, and a subsequent search uncovered approximately 24 pounds of methamphetamine in the passenger-side airbag compartment.

## II.    Analysis

Defendant moves to suppress the methamphetamine found in his vehicle, arguing Trooper McGee illegally prolonged the initial traffic stop. Defendant also claims there was not probable cause to search the car based on Zeke's indication because Zeke was unreliably trained and failed to signal a final indication.

### a.    Prolonged Traffic Stop

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. amend. IV. "The stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment." *United States v. McSwain*, 29 F.3d 558, 560 (10th Cir. 1994). A traffic stop, however, is a limited seizure, and is "more like an investigative detention than a custodial arrest." *United States v. Walker*, 933 F.2d 812, 815 (10th Cir. 1991). Because a traffic stop is more analogous to a "Terry stop" than to a formal arrest, courts judge the reasonableness of a traffic stop based on the principles in *Terry v. Ohio*, 392 US. 1 (1968). *Id.* Courts judge the reasonableness of a traffic stop based on 1) "whether the officer's action was justified at its inception," and 2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (citing *Terry*, 392 U.S. at 20).

A traffic stop, once initiated, may last only as long as necessary to complete the "mission" of the stop—or "to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 135 S.Ct.

1609, 1614 (2015).  A stop may not last longer than necessary to address the infraction that is the purpose of the stop.  *Id.*  Therefore, "authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.*  The Supreme Court, however, has also held that during a traffic stop, certain "unrelated investigations" are allowed, so long as they do not "measurably extend the duration of the stop."  *Id.* at 1614–15.  An officer may "conduct certain unrelated checks during an otherwise lawful traffic top," so long as he does not "prolong[] the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id.* at 1615.  These "unrelated inquiries" may include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.")  *Id.* (noting that these checks "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.")

Defendant argues his case is on point with the Tenth Circuit's decision in *McSwain*, in which the court found a trooper had violated a defendant's Fourth Amendment rights by unlawfully detaining him longer than necessary to achieve the "mission" of the stop.  29 F.3d at 561–62.  The trooper had stopped the defendant because his vehicle had a temporary registration sticker posted in the rear window and the trooper was unable to read the expiration date.  *Id.* at 560.  As the trooper approached the vehicle, he saw that the temporary registration sticker was from Colorado and was valid.  *Id.*  He then approached the defendant and began asking him questions, including requesting his identification and vehicle registration.  *Id.*  When the trooper ran a criminal history check, he found the defendant had a suspended driver's license and a prior record for drug and gun violations.  *Id.*  The trooper then obtained consent to search the defendant's car and found cocaine.

The Tenth Circuit found that the trooper had stopped the defendant for the "sole purpose" of ensuring the validity of the vehicle's temporary registration sticker.  *Id.* at 561.  When the trooper

-6-

confirmed the sticker was valid, the court determined that the purpose of the stop was satisfied and further detention "exceeded the scope of the stop's underlying investigation." *Id.* And although the law does allow for "minimally intrusive" investigation during a stop, any investigation must occur when an officer "still has some 'objectively reasonable articulable suspicion' that a traffic violation 'has occurred or is occurring.'" *Id*. Because the trooper had already confirmed that there was no traffic violation because the temporary registration sticker was valid, he no longer had any reasonable suspicion that illegal activity had occurred or was occurring, and any further detention violated the Fourth Amendment. *Id.* at 561–62.

Here, defendant claims that like in *McSwain*, Trooper McGee stopped him because his registration was expired, and once he verified that the vehicle had valid registration he should have ended the detention. The Government, however, argues that Trooper McGee stopped defendant and detained him on suspicion of multiple traffic infractions, including violations of Kansas law which prohibit the obstruction of a license plate and affixing registration information to the windshield. Once defendant was stopped, Trooper McGee also developed reasonable suspicion that he was violating federal immigration law because his passenger admitted to being unlawfully present in the United States. These ongoing violations, according to the Government, gave Trooper McGee reasonable suspicion to detain defendant and to conduct the routine "unrelated investigations" allowed for under the law.

Defendant argues that Trooper McGee did not have objectively reasonable articulable suspicion that any of these violations had occurred or were still occurring. Defendant claims that his license plate was not obstructed in violation of K.S.A. § 8-133, because it was "clearly legible," and that California law allows for new vehicle registrations to be affixed to the front windshield. Defendant notes that Kansas grants reciprocal privileges to out-of-state drivers so long as the vehicle is duly licensed in its home state. Defendant also argues that Trooper McGee did not have probable cause to believe that he

had violate any federal immigration laws because there was no evidence that he "knowingly or with reckless disregard" transported an unlawful alien under 8 U.S.C. § 1324(a)(1)(A)(ii).

K.S.A. § 8-133 provides that:

> The license plate assigned to the vehicle shall be attached to the rear thereof and shall be so displayed during the current registration year or years . . . . Every license plate shall at all times be securely fastened to the vehicle to which it is assigned so as to prevent the plate from swinging, and at a height not less than 12 inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible. During any period in which the construction of license plates has been suspended pursuant to the provisions of K.S.A. 8-132, and amendments thereto, the plate, tag, token, marker or sign assigned to such vehicle shall be attached to and displayed on such vehicle in such place, position, manner and condition as shall be prescribed by the director of vehicles.

Trooper McGee testified he stopped defendant because the license plate had been expired for sixty days and was registered to an individual with the last name "Black," and because the license plate bracket partially obstructed the letters "C," "l," and "f" in the word "California." Trooper McGee also mentioned during the encounter that defendant was violating the law by displaying his registration on his front windshield and that it was illegal to display tags registered to another individual.

The Government cites *United States v. Orduna-Martinez*, 561 F.3d 1134 (10th Cir. 2009), as support that defendant's license plate bracket violated K.S.A. § 8-133 because it obstructed parts of the letters in the word "California." In *Orduna-Martinez*, the defendant's Ohio State Buckeyes tag bracket obstructed the top of the word "Ohio" on the license plate. *Id.* at 1140. The Tenth Circuit did find that the defendant's tag bracket violated K.S.A. § 8-133, but not because it obstructed the word "Ohio." Instead, the court found that the plate was not "clearly legible" as required by K.S.A. § 8-133 because the bracket obstructed the registration decal. *Id.* at 1139.

The court agrees that it was not reasonable for Trooper McGee to stop defendant for violating K.S.A. § 8-133 based on the obstruction of the letters "C," "l," and "f." The plate on defendant's vehicle was obviously "clearly legible" under the law because Trooper McGee was able to read the necessary

information to check the validity of the plate. The plate, however, was in violation of Kansas law for numerous other reasons. First, it is a violation of Kansas law to display a license plate registered to another individual. *See* K.S.A. § 8-135 ("Upon the transfer of ownership of any vehicle registered under this act, the registration of the vehicle and the right to use any license plate thereon shall expire and thereafter there shall be no transfer of any registration, and the license plate shall be removed by the owner thereof . . . . it shall be unlawful for any person, other than the person to whom the license plate was originally issued, to have possession thereof."). Also, the "clearly visible" and "clearly legible" requirements of K.S.A. § 8-133 apply to temporary registration tags. *See United States v. Poke*, 81 F. App'x 712, 715 (10th Cir. 2003).

Notably, in *Poke* the Tenth Circuit rejected the defendant's reliance on *McSwain* after he was pulled over because the trooper could not see a license plate or temporary registration tag. *Id.* at 715. As the trooper approached the vehicle, he saw a current Missouri temporary registration tag taped inside the rear window. *Id.* at 713. The Tenth Circuit found that unlike *McSwain*, where the trooper could see the tag but could not confirm the expiration date, here the trooper could not see the temporary tag at all. *Id.* at 715. Therefore, the trooper properly detained the defendant because he "continued to have an objectively reasonable suspicion that a traffic violation was occurring . . ." *Id.*

The court finds the facts of the present case are more analogous with *Poke* than with *McSwain*. Defendant was stopped because the plates on the vehicle were expired. When Trooper McGee began to question him, defendant provided proof of registration that was attached to the front windshield of the vehicle. This created reasonable suspicion that defendant was in violation of K.S.A. § 8-133 because his temporary registration was not clearly visible or legible and because it was attached to the front of the vehicle, not the rear. And, additionally, the expired plates that were on the vehicle belonged to another individual, also in violation of Kansas law. Defendant argues that displaying the registration in

his front windshield is allowed under California law. The Tenth Circuit, however, has held that even though Kansas law allows for reciprocal privileges for out-of-state drivers, "the display of an illegible or obscured vehicle tag is a violation of K.S.A. § 8-133 even if the vehicle is duly licensed in another state." *United States v. Martinez*, 518 F.3d 763, 767 (10th Cir. 2008) (citing *State v. Hayes*, 660 P.2d 1387, 1389 (Kan. Ct. App. 1983)). Further, the Tenth Circuit found that state troopers "cannot be expected to possess encyclopedic knowledge of the traffic regulations of other states." *Id.* at 768 (noting "even if the reciprocity statute might've afforded [defendant] a good defense against any effort to prosecute him for a violation of K.S.A. § 8-133, we cannot say that, for the purposes of the Fourth Amendment, the trooper's skepticism about the propriety of the permit and its placement, as well as his concomitant decision to detain [defendant] briefly to run a computer check, was objectively unreasonable.").

The court would also note that Trooper McGee also had reasonable suspicion to detain defendant after his passenger admitted he was in the country illegally. Even if Trooper McGee was unsure if defendant actually knew his passenger's immigration status, this is immaterial as to whether he had *reasonable suspicion* that defendant may be knowingly transporting an illegal alien under 8 U.S.C. § 1324(a)(1)(A)(ii). *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (noting "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification . . . the officer must be able to articulate more than an 'incohate and unparticularized suspicion or hunch' of criminal activity."). For these reasons, the court finds Trooper McGee had reasonable suspicion to detain defendant even after he confirmed the vehicle was validly registered.

b. Dog Sniff

Defendant also argues that the fruits of the search should be suppressed because the dog sniff did not create probable cause to search his vehicle. Defendant claims that Zeke's training was unreliable and that Zeke's behavior during the search was not consistent with his prescribed behavior for alerting and indicating to the scent of narcotics.

"Probable cause means that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). A dog sniff is a measure used to establish probable cause, aimed at "detecting evidence of ordinary criminal wrongdoing." *Rodriguez*, 135 S. Ct. at 1615. The Tenth Circuit has held that a dog alert "usually is at least reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband." *Ludwig*, 10 F.3d at 1527. A dog alert, without more, is enough to constitute probable cause for searches and seizures. *Id.* A dog alert, however, "might not give probable cause if the particular dog had a poor accuracy record." *Id.* at 1528.

Defendant first argues that the Kansas Highway Patrol's certification program is not reliable and therefore Zeke's alert was unreliable and not a sufficient basis for probable cause.

"Evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Florida v. Harris*, 568 U.S. 237, 246 (2013). So long as a "bona fide organization has certified a dog after testing his reliability in a controlled setting," a court can presume "that the dog's alert provides probable cause to search." *Id*. at 246–47. A defendant bears the burden of proving a dog unqualified. *United States v. Parada*, 577 F.3d 1275, 1283 (10th Cir. 2009). When deciding whether probable cause existed based on a dog sniff, the court should determine whether "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a

reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

Here, defendant specifically attacks the "lax standards" of the Kansas Highway Patrol's certification program. Defendant notes that the Kansas Highway Patrol's program uses standards developed by an individual named Wendell Nope, and all judges have certified according to these standards. The Kansas Highway Patrol, according to defendant, does not strictly adhere to the Nope standards, and instead relaxes the program in certain ways including not requiring annual recertification, allowing a dog to be certified who has given a false positive, and requiring only one diversion—instead of four—in certification scenarios.

The law, however, does not require any certain standards or even "formal certification." The Supreme Court has held that a dog's alert can provide probable cause to search so long as the dog "has recently and successfully completed a training program that evaluated his proficiency in locating drugs," as law enforcement has a "strong incentive" to use effective training and certification programs. *Harris*, 568 U.S. at 247.

Here, Lt. Walker testified that Zeke successfully completed a 10-week training program, was certified, had been recertified annually in 2016 and 2017, and participates in maintenance training—which is eight-hour training at least once a week. Zeke also passed his 2017 recertification (completed the morning before the search of defendant's vehicle) with a score of 2.03 out of 6, which translates to a "B" grade. An average "veteran" patrol dog typically receives a score of 3—so Zeke was recertified with a higher than average score. Defendant has not shown any evidence that the training and certification program used by the Kansas Highway Patrol is insufficient—even if it does not strictly adhere to the Nope standards. For these reasons, the court finds that Zeke's training was sufficient.

Beyond his training, defendant also argues that Zeke's behavior during the sniff did not create probable cause to search his car. Zeke is trained to "passively" indicate to the presence of drug odor, which means Zeke will either sit, freeze, or lay down. Defendant claims that Zeke did not react the way he was trained to signal an indication, and Lt. Walker instead chose to interpret Zeke's behavior as an indication.

Lt. Walker testified regarding the difference between an "alert" and an "indication." An alert, according to Lt. Walker, is an "intense, calm, methodical, intense focus sniffing," and may not be visible to a lay person, but would be a behavior the handler would observe as typical for the dog. (Hrng. Tr. 58:05-8.) An indication is the "final response," meaning the dog has indicated the source of the scent. The Tenth Circuit has held that "a dog's alert to the presence of contraband is sufficient to provide probable cause," and declined to adopt a strict rule requiring the dog to give a "final indication before probable cause is established." *Parada*, 577 F.3d 1282 (holding, "probable cause was satisfied by [the narcotic's dog's] alert to the odor of an illegal substance in the vehicle and that it was not necessary for the dog to indicate the exact source of that odor."). And while a "change in behavior" rather than a full alert is not sufficient to support probable cause, the "behavior change could be considered in the totality of circumstances." *United States v. Munoz-Nava*, 524 F.3d 1137, 1145 (10th Cir. 2008).

Here, the court both heard testimony regarding the dog sniff and watched the video footage. According to Lt. Walker, Zeke is trained to break the "down" position only to protect his handler from a threat or if he senses drug odor. When Zeke was deployed at the scene of the car stop, Zeke immediately broke the down position without Lt. Walker's command. Zeke went first to the trunk seam and sniffed intensely along the seam of the trunk and the bumper. Lt. Walker testified he considered this "alerting behavior"—Zeke had detected drug odor but couldn't yet pinpoint the source of the odor. Lt. Walker then guided Zeke around the car and Zeke again focused on the trunk and bumper seam. He

froze, his rear quarters went down a little bit, and his body posture changed all while remaining focused on the trunk. Lt. Walker testified that while this was not his prescribed indication, he considered the behavior change an indication as he previously has seen Zeke behave in this manner.

The video shows Zeke sniffing the car as Lt. Walker described in his testimony. It is not entirely clear whether Zeke "indicated" in the way he is trained, but what was seen on the video, combined with Lt. Walker's testimony that he has seen Zeke indicate or alert in that manner before, convinces the court that Zeke's behavior was enough to create probable cause for the search.

Defendant's claim that probable cause did not exist because Zeke did not give a conclusive final indication is not consistent with Tenth Circuit law. First, Lt. Walker testified that he considered Zeke's "intense sniffing" as "alerting behavior," meaning Zeke had sensed drug odor but had not yet located the source of the odor. This, according to the Tenth Circuit, provides probable cause. *See Parada*, 577 F.3d at 1282 (noting, "[o]ur other dog alert cases do not specify whether the dog's response was a general alert or a final indication; we have simply noted that the dog's "alert" provides probable cause."); *see also United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015) (finding the narcotics dog's "positive alert" and "really good change of behavior" was enough to provide probable cause even though the dog did not provide his final indication by "sitting and staring at the source of the odor."). Even if Zeke's behavior was not an "alert," his behavior change, combined with other factors Trooper McGee testified gave him reasonable suspicion of drug activity, were enough to constitute probable cause to search defendant's vehicle. Trooper McGee testified to numerous factors that led him to believe there were drugs in defendant's car, including: (1) the vehicle's recent registration and purchase, (2) presence of multiple cell phones, (3) inconsistent travel plans, and (4) prior criminal history for drug trafficking. The combination of these factors, along with Zeke's change in behavior, were enough to create probable cause to search defendant's vehicle. *See Moore*, 795 F.3d at 1231 (finding the defendant's nervousness,

his criminal history, and the recent registration of his vehicle, considered in totality, created reasonable suspicion to continue to detain the defendant and the narcotics dog's change in behavior during the sniff created probable cause to search the vehicle.) For these reasons, the court finds there was probable cause to search defendant's vehicle and his motion to suppress is denied.

**IT IS THEREFORE ORDERED** that Motion to Suppress (Doc. 30) is denied.

Dated August 24, 2018, at Kansas City, Kansas.

s/ Carlos Murguia
**CARLOS MURGUIA**
**United States District Judge**